F. F. FROST et al., Appellees, v. E. H. RICH et al., Appellants.

**FRAUD: False Representations—Fact and Opinion.** False representations (1) as to the sale consideration of a farm, (2) as to the profits made in the operation of the farm, and (3) as to the amount of the initial payment thereon, made with the intent to strengthen the value of the second mortgage securities on the farm (which securities were the subject-matter of the contract in question), are representations of fact, and not of opinion.

**FRAUD: Reliance on Representations—Nonduty to Investigate.** A defrauded party is not precluded from relying on fraudulent repre-

sentations as to property because of the fact that he did not carry his investigation of the property to the point where he would have discovered the falsity of representations which were peculiarly within the knowledge of the fraud-doer.

**DEEDS:** Rights Acquired—Notice of Outstanding Equities. A quit-
3 claim deed holder must take notice of outstanding equities.

Headnote 1: 26 C. J. p. 1223. Headnote 2: 26 C. J. p. 1152. Headnote 3: 18 C. J. p. 314; 39 Cyc. pp. 1693, 1694.

*Appeal from Polk District Court.*—LESTER L. THOMPSON, Judge.

NOVEMBER 19, 1924.

REHEARING DENIED FEBRUARY 13, 1925.

ACTION in equity for the rescission of a contract for the exchange of properties and the cancellation of a deed executed in pursuance thereof. There was a decree in the court below in favor of plaintiffs, and the defendants appeal.—*Affirmed.*

*E. B. Stillman* and *Hunn & Jones,* for appellants.

*Casper Schenk* and *Bert Welty,* for appellees.

STEVENS, J.—This is an action for the rescission of a contract for the exchange of certain securities for real property in the city of Des Moines, known as the Ayrshire Apartments, and
1. FRAUD: false    for the cancellation of a deed executed in pur-
representations:    suance of such contract. The record, which is
fact and
opinion.    unnecessarily voluminous, is incumbered with much incompetent and irrelevant testimony, and it is with some misgivings that we attempt to make a clear and accurate recital of the facts. It appears, however, without dispute in the evidence, that appellees were the joint owners of the Ayrshire Apartments, located in the city of Des Moines; that appellant E. H. Rich was the owner of second mortgages upon an 880-acre tract of land near Clear Lake, in Cerro Gordo County, Iowa, aggregating $102,600, and of other securities. The second mortgages were executed by Harry and Ticia Brooks, to whom the land was conveyed by appellants on December 16, 1920. The

first mortgages upon different portions of the 880-acre tract ag-- gregated $57,400. In addition to the above incumbrances, drainage taxes were laid upon the land in the sum of $28,500. Appellees having offered the Ayrshire Apartments for sale, negotiations between them and Rich for the exchange thereof for the securities referred to began in the spring of 1921, and culminated in the execution of a written contract to that effect on June 15, 1921.

The Ayrshire Apartments were valued in the contract at $212,500, and were conveyed to Rich subject to an incumbrance of $72,500. The contract recited that the value placed upon the property was for the purpose of the trade. The evidence showed that the apartments were built in 1919 at a cost, including the lots, of approximately $160,000. Rich agreed to assign the second mortgages upon the Cerro Gordo County farm, aggregating $102,600, together with a mortgage of $8,000 on other land in Cerro Gordo County, subject to a first mortgage of $6,000, a mortgage of $9,000 on a quarter section in Howard County, subject to a mortgage of $17,000, also a mortgage of $11,000 on 1,817 acres of land in Cherry County, Nebraska, subject to a mortgage of $9,000, and to convey certain other land to appellees in Cerro Gordo County, subject to first mortgages of $10,700, and to assign a contract of sale held by him for said land, on which there was a balance due of $9,300. Other provisions of the contract need not be stated. The papers were finally exchanged on or about October 10, 1921.

Relief is sought by appellees upon the ground of fraud in the original transaction. The fraud charged in the petition is that appellant E. H. Rich represented to them that the consideration for the sale of the 880-acre tract to Brooks was $194,800, or approximately $221 per acre; that he paid in cash, or its equivalent, $34,800; and that this sum represented his net accumulations available for the purchase of the farm during the thirteen years he had occupied and cultivated it as a tenant. The testimony covers a wide range, and much of it has little, if any, bearing upon the issues to be decided. Largely, fact questions only are involved.

The real matter for decision is: Was there any such misrepresentation of the facts bearing upon the value of the se-

curities traded to appellees as to justify a decree canceling the
deed and the rescission of the contract of June 15, 1920? This
is the primary question to be determined, and not the value of
the land upon which the securities were liens. There is much
conflict in the evidence, and great difficulty has been encoun-
tered in arriving at a satisfactory conclusion of the facts. It is
urged on behalf of appellants that the marked depreciation in
property values is responsible for the controversy, and that no
misrepresentations of any kind were made, to induce appellees
to enter into the contract.

Harry Brooks and his family resided upon the Cerro Gordo
County land for thirteen years, under an agreement with Rich
& Rogers, a copartnership, or E. H. Rich, appellant, for an
equal division of the proceeds derived from the farming oper-
ations, which included, in addition to the growing of crops, the
purchase, feeding, and sale of cattle and hogs in large numbers.
This arrangement was terminated March 1, 1920, when a di-
vision was made of the personal property upon the premises.
The extent of the personal property which was divided between
them is not very conclusively shown. One witness testified that
he appraised the property, and that the share of Rich & Rogers
was $18,720.01, and that all of this property was sold to Brooks.
Rich also testified to the division and the sale of his interest
in the property to Brooks. Just how the consideration for this
sale was paid is not shown. It is clear, however, that Brooks
paid no part of it in cash. The custom of dealing between Rich
and Brooks naturally suggests that chattel mortgages were exe-
cuted to secure the purchase price. Brooks also testified to the
presence on the farm at that time of a large quantity of stock
and farm implements. Brooks, however, is largely discredited
as a witness by his testimony upon a prior occasion in a pro-
ceeding against him, auxiliary to execution. In that proceeding
he testified that there was a very small quantity of stock on the
premises in March, 1920.

Rich, R. R. Rogers, his bookkeeper, and Brooks and wife,
all testified that the consideration paid by the latter for the
880-acre tract was $194,800; that the sale was consummated at
the office of appellant in Clear Lake, December 16, 1920, when
a contract setting forth in detail the terms of the sale, and a

deed from appellants, conveying the property to Mrs. Brooks, were executed and left in the care of Rogers. It appears from the testimony of Rich and Harry and Ticia Brooks that negotiations for the purchase of the farm were begun in 1919, and continued from time to time until the papers were executed. Mortgages upon different tracts of the farm, aggregating $57,400, had previously been executed. Three second mortgages, divided among the tracts referred to, aggregating $102,600, were executed by Harry and Ticia Brooks to Rich on the above date. These are the mortgages in controversy. It is conceded by appellants that no part of the consideration was paid in cash. The manner in which it is claimed the $34,000 was paid is, however, shown by the evidence. More than $17,000 of it consisted of a credit upon the books of account between Rich and Brooks; $8,800 of it was in due bills previously issued by Rich to Brooks in payment of alleged commissions on the sale of land; and the balance, of $8,508.73, was secured by a note of Harry and Ticia Brooks', due in five years. The larger part of the $17,000 item was also made up of notes signed by Brooks, one of which was an accommodation note of $5,000. Rich at all times denied that he at any time represented to appellees that the alleged $34,000 payment was made in cash or its equivalent, but, on the contrary, testified that he stated to them that it was in part paid by credit upon a book account, and that he offered to produce the account. We shall not review the testimony at length upon this point. We are convinced that the representations were made substantially as charged. We are strengthened in this conviction by the admission of appellant in a letter to the appellee Frost, dated November 15, 1922, in which he again asserted that Brooks had a credit on the books of more than half of the $34,000, and that not half, but more than half, of the balance was paid in cash. It is true that in this letter he denied the representations. The statement, however, therein made that more than half of the $34,000 was paid in cash is shown, by the evidence offered in his behalf, to be an error. We do not overlook the fact that the evidence as to the representations made is in conflict, and that the testimony of appellant is not without corroboration. Our conclusion, however, is based upon a careful analysis of the testimony upon this point as a whole.

It is contended by appellees that the true consideration for the deed was $185 per acre, and that the pretended $34,000 payment was for the purpose of giving apparent value to the second mortgages, aggregating $102,600. As the transaction of December 16, 1920, was agreed upon and consummated on that day, the execution of a formal contract between the parties was apparently quite unnecessary. The contract was indorsed, "Canceled and deed given." This alone, however, would cast little or no suspicion upon the transaction. The parties may well have intended it to evidence their final settlement, as well as the terms of the sale. Brooks, however, was not furnished with a copy of the contract. The consideration expressed in the deed was one dollar and other good and valuable consideration. Revenue stamps to the amount of $105 were affixed to the deed, and canceled as of December 16, 1920. $35 of revenue stamps were affixed thereto July 11, 1921, and canceled by the county recorder. It is contended by appellees that the stamps originally affixed to the instrument were for the true consideration, and that the additional stamps placed thereon in July were for the purpose of giving effect to the claim that the consideration was in excess of $185 per acre. This transaction is sought to be explained by Rogers, the bookkeeper for appellant. He testified that they were able to secure but $105 worth of stamps at the time the deed was executed, and that he requested the recorder to affix the additional amount at the time the deed was recorded. This was several months after the deed was executed. Several witnesses were called, to impeach the testimony of Brooks as to the consideration paid by him for the farm. These witnesses testified that he told them that the true consideration was $185 per acre. Brooks is further discredited as a witness by his own testimony in the auxiliary proceeding above referred to. He testified at that time that the contract for the purchase of the farm was executed in 1919 in the hayfield.

Brooks kept no books. The books showing the transactions between him and Rich were kept in the office of the latter. Brooks testified that he knew nothing about the account; that he trusted Rich entirely to keep the books; that he never, during the thirteen years he was a tenant, inquired about the account; that he did not know whether it showed a balance in his favor

or not; that he never withdrew any cash; and that the family relied upon their produce and other incidental matters, for a livelihood. He testified that he was informed by Rich, some time before the contract for the purchase of the farm was entered into, that the books showed a balance in his favor. He did not inquire, however, as to the amount, and never knew it until the day the papers were executed. So far as the account is shown by the record, no substantial balance was ever due Brooks, prior to 1920. On January 7th, his account was overdrawn $179.09. The due bills which figured in the transaction were executed as follows: one for $5.00 per acre on the sale of 1,120 acres, without specifying the aggregate; and the other, dated December 27, 1919, is also for commissions at the same rate, for the sale of 640 acres of land to P. E. Shugart, to be paid when the deal was closed. The amount of the two due bills, as stated, was $8,800. Brooks testified that these instruments were turned over to him at or about the time they purport to have been executed, and that they were retained in the home until they were taken to Clear Lake, December 16th, to be credited upon the land deal. The memorandum written on each of the due bills and signed by Harry and Ticia Brooks acknowledges payment thereof by credit on the purchase price of the land. These memoranda are dated December 16, 1920. We shall not detail the evidence on this point, but it clearly shows that no services whatever were rendered by Brooks in the Shugart deal, and that he never met Shugart until afterwards, and that no material services were rendered in the other transaction. These due bills, according to the testimony of both Rich and Brooks, were in the possession of the latter in March, when the division was made of the personal property and more than $18,000 of it was sold to Brooks. Brooks did not keep a bank account. He was always without any substantial amount of cash. A judgment for $1,200 had long stood against him, which evidently could not be collected. This would appear to have been a proper time for the due bills to have been surrendered by Brooks. It is true that the personal property sold to Brooks was the property of Rich & Rogers. This may afford an explanation of the failure to apply the due bills at that time. It was the custom of Rich to have Brooks execute accommoda-

tion notes to him. Notes of this character aggregating many
thousands of dollars were executed and used by Rich to secure
funds for financing and carrying on his business. It is perhaps
immaterial whether the consideration for the land was $185 per
acre, which was approximately the amount of the mortgages
against it, or whether it was $221 per acre, paid for as claimed
by appellants. Much of the consideration above the aggregate
amount of the mortgages was paid in what appears to have been
fictitious paper, a practically worthless note, and a credit of
items upon a book account of a more or less doubtful character.
Brooks has never been able to pay the interest on the mort-
gages, or the drainage taxes that have matured against the land.

It is disclosed by the record that the Ayrshire Apartments
yielded an annual income of $32,000, and that the incumbrances
did not exceed 50 per cent of the value of the property. Brooks
admitted in his testimony that he received the announcement of
Rich that he would pay him a commission of $5.00 per acre
for helping to sell his farms as "a joke," and that in his judg-
ment the value of the 880-acre tract does not exceed the drain-
age taxes and the first mortgages thereon. One other witness
testified that in his judgment the land was worth from $210 to
$225 per acre. Its value doubtless lies somewhere between these
two extremes. It is clear, however, that the second mortgages
traded to appellees are of little or no value. The personal equa-
tion enters little, if at all, into their value. Brooks has nothing
with which to pay them, and it is obvious that the land will not
yield a sufficient income to enable him to do so. Frost testified
that he inquired of Rich as to the financial standing of Brooks
and as to the amount of his indebtedness, and that Rich replied
that Brooks owed little, and that he did not know whether the
latter was indebted to him in any sum or not, and that, if so, it
was for a small amount. This testimony is denied by Rich. If
the statement was made as claimed, it was erroneous, and this
must have been known to Rich. The purpose of the represen-
tations made by appellants to appellees is obvious. It was to
give value to the securities which Rich proposed to give in ex-
change for the Ayrshire Apartments. It was important for ap-
pellees to know whether the $34,000 was paid in cash, its equiv-
alent, or in trade. It went directly to the value of the mort-

gages. The representations, if made, were material, and appellees claim that they were induced thereby to enter into the contract. They were statements of fact, and not matters of opinion. Both appellees testified that, if they had known that the alleged $34,000 payment had been made in the manner shown by the evidence, they would not have accepted the mortgages in payment for the property. It is sufficient to assume that, if they had known all of the facts as detailed in the evidence, they would not have done so. It is true that appellees visited the farm and made some inspection of it before the contract was entered into. They were not, however, bound to make such investigation as would establish the falsity of the representations made as to the price at which it was sold to Brooks or as to the financial condition of the latter. They had a right to rely upon the information given them by appellant, who they knew was in possession of all of the facts.

2. FRAUD: reliance on representations: nonduty to investigate.

Depreciation in the value of the land since the mortgages were executed has, no doubt, affected their value. For this, of course, appellant is not to blame. Depreciation of this character has not affected the ability of Brooks to pay the indebtedness out of the income of the land. The representation that the alleged $34,000 payment was made by Brooks out of accumulations received by him from his farming operations is clearly not sustained by the evidence. No such income has been received from the farm, and the paying ability of Brooks was grossly exaggerated by statements to that effect. The advantage obtained by appellants in the transaction is unconscionable. The value of the mortgages is and was negligible.

But it is contended on their behalf that an undivided one-half interest in the Des Moines property was conveyed by E. H. Rich to Maud Rich, his wife, by a quitclaim deed, and that she had no notice of the fraud charged. The grantee in a quitclaim deed takes the property subject to prior equities, and is not a bona-fide purchaser for value. *Duntz v. Ames Cem. Assn.*, 192 Iowa 1341; *Mohr v. Joslin*, 162 Iowa 34. She is not shown to have paid any consideration for this conveyance.

3. DEEDS: rights acquired: notice of outstanding equities.

Some contention is made by counsel for appellants that the

representations, if made as charged, are not actionable; that they were not material, and in effect were of matters collateral in their nature. Authorities need not be cited upon this point. The materiality of the representations is apparent.

We have omitted further reference to the other securities traded by appellant, and to many matters in the record. We have discussed the controlling facts, and this is all that is necessary. Some of the other securities have been wiped out by the foreclosure of prior incumbrances.

On account of the large sums involved, and the great importance of the issues to the litigants, we have made a laborious and painstaking study of the record, with the result that we are convinced that the decree of the court below is right, and that no other conclusion consistent with the facts, circumstances, and necessary inferences therefrom could have been reached. The judgment and decree below is, therefore,—*Affirmed.*

ARTHUR, C. J., and PRESTON and VERMILION, JJ., concur.